# EXHIBIT "3"

Execution Version

MASTER LEASE AGREEMENT

This Master Lease Agreement (the "Agreement"), dated as of March 8, 2022 (the "**Effective Date**""), is by and between **NEXII BUILDING SOLUTIONS INC.**, a company incorporated under the laws of British Columbia and having its head office at 1455 West Georgia Street, Vancouver, British Columbia, Canada, on behalf of itself and its subsidiaries from time to time (together with its successors and assigns, "**Lessor**"), and **NEXUS 1, LLC**, as "**Lessee**", a limited liability company formed under the laws of Delaware and having its chief executive office and any organizational identification number as specified with its execution of this Agreement below.  Certain defined terms used herein are identified in bold face and quotation marks throughout this Agreement and in Section 15 below.  This Agreement sets forth the terms and conditions for the lease between Lessor and Lessee for the equipment listed on Schedule A (defined below) and with other documents and instruments executed and delivered in connection with this Agreement (as amended from time to time, the "**Lease**").  This Agreement is not an agreement or commitment by Lessor or Lessee to enter into any future leases or other agreements, or for Lessor to provide any financial accommodations to Lessee.  This Agreement shall become effective only upon Lessor's acceptance and execution.

WHEREAS, Lessee entered into valid and binding purchase contracts and invoices (the "**Equipment Purchase Contracts**") for the purchase from various Vendors of the equipment (the "**Equipment**") listed on Schedule A attached hereto and incorporated herein ("**Schedule A**").  The total purchase price for the Equipment totaled $4,635,832.14 (the "**Total Equipment Purchase Price**").

WHEREAS, after initiating orders for the Equipment, and paying $1,206,446,33 of the Total Equipment Purchase Price (which Lessor will reimburse to Lessee under terms not covered in this Agreement), Lessee authorized Lessor to pay the remaining purchase price for the Equipment, and directed the Vendors to transfer title through the issuance of Purchase Orders issued in favor of Lessor.  Lessor paid or will pay an additional amount of $3,429,385.81 and took title to all of the Equipment, and in anticipation of entering into this Agreement, directed the Vendors to deliver the Equipment to Lessee.

WHEREAS, Lessee and Lessor previously agreed that Lessee would pay interest in connection with the financing by Lessor of the Equipment in a cumulative amount of $199,913.15 with respect to the period from August 13, 2021 through and including April 30, 2022.

WHEREAS, Lessee and Lessor are party to that certain letter agreement Re: NEXII Manufacturing Facility / Nexii Advance by and between the Maker and Payee (a/k/a Nexus Corp LLC) dated as of January 11, 2022 (the "**Existing Letter Agreement**") pursuant to which Lessor advanced to Lessee cash in the amount of $400,000.

WHEREAS, Lessee and Lessor agreed under the Existing Letter Agreement that Lessee would pay interest under the Existing Letter Agreement in a cumulative amount of $12,243.84 with respect to the period from January 11, 2022 through and including April 30, 2022.

WHEREAS, Lessor and Lessee now desire to memorialize their agreements regarding the Lease of the Equipment on the terms set forth in this Agreement.

**1.**     **Lease; Term; Non-Interference.**  Lessor agrees to lease the Equipment described in Schedule A to Lessee, together with all other documentation required by Lessor from Lessee with respect to the Lease.  By executing this Agreement, Lessee irrevocably accepts such Equipment for Lease in an "AS IS, WHERE IS" condition, subject to any warranty rights held against the Vendors as set forth in Section 3.  Provided no Event of Default has occurred, Lessee shall be entitled to use and possess the

Equipment during the Lease Term free from interference by any person claiming by, through or under Lessor.

       **2.**      **Rent.** "**Rent**" shall be payable to Lessor as follows:  (a) a one-time payment on June 1, 2022 in the amount of $ 212,156.99 (the "**One-Time Payment**") and (b) monthly beginning on June 1, 2022, and continuing on the 1st day of each month thereafter for an additional 119 months, in installments in the amount of the Monthly Rent Amount during the Lease Term.  The "**Monthly Rent Amount**" shall initially be $67,247.99 per month, and shall be calculated using an interest rate equal to the sum of (i) the per annum rate of interest from time to time published in The Wall Street Journal or any successor publication thereto as the "prime rate" then in effect, plus (ii) 7.00%; provided that, in the event that such rate of interest published in The Wall Street Journal is less than 3.25%, such rate shall be deemed to be 3.25% for purposes of calculating the interest rate, provided, further, that if the "prime rate", (A) is no longer reported in the Wall Street Journal, (B) is no longer widely used as a benchmark market rate, or (C) becomes permanently unavailable, Lessor's lender shall select a successor benchmark rate, which successor rate shall be applied in a manner consistent with market practice, or if there is no consistent market practice, such successor rate shall be applied in a manner reasonably determined by Lessor's lender. Notwithstanding the foregoing, in no event shall the interest rate be less than 10.25%. Lessee acknowledges that the "prime rate" is used for reference purposes only.  The interest rate applied as of the Effective Date shall be the interest rate on the date that is five (5) business days prior to the Effective Date.  Upon any fluctuation to the interest rate that would cause such rate to rise above 10.25%, the Lessor shall advise the Lessee in writing (including by email) of the new Monthly Rent Amount calculated in accordance with this paragraph.   To the extent that the parties agree in writing that additional equipment or any costs of equipment will be paid by Lessor to a Vendor after the date hereof, and such equipment or costs are not included in the Total Equipment Purchase Price, Lessor shall (i) adjust the amount of Rent payable hereunder for the remainder of the Lease Term on the same terms as Rent payable on the Equipment to give effect to such additional equipment or costs, (ii) adjust Exhibit 1 hereto to reflect the same, (iii) give written notice of such adjustments to Lessee, and such equipment shall be deemed "Equipment" for all purposes hereunder, and (iv) update Schedule A to reflect such Equipment.  If Rent is not paid by the 1st of the month, Lessee shall have a 10 day cure period to pay the Rent, and if it fails to cure the default, Lessee shall pay an administrative late charge of 3.0% of the amount not timely paid.  All Rent and other amounts payable under the Lease shall be made in immediately available funds by pre-authorized electronic funds transfer from lessor's bank account to the account specified by Lessor in writing to Lessee.  Unless otherwise provided herein, payments received under the Lease will be applied to all interest, late fees and other amounts owing thereunder (other than Rent), and then to Rent payable thereunder.  In the event Lessee's working capital or available cash do not allow for Rent to be payable commencing on June 1, 2022, after presentation to Lessor of adequate financial information to demonstrate the veracity of the working capital or available cash position (as evaluated in the reasonable discretion of Lessor), Lessee may extend the date of the One-Time Payment and the date of the initial monthly Rent payment on a month-to-month basis (provided that for each subsequent monthly extension, Lessee must make such presentation and demonstration of such conditions), provided that no such extension shall continue beyond December 31, 2022.  During any such extension, interest shall continue to accrue on amounts owing under this Agreement. Upon exercise of such extension, Lessor shall update the amount of Rent payable hereunder and shall update Exhibit 1 hereto and shall be entitled to make any other recalculations it reasonably determines necessary to reflect the accrual of interest and timing of such payments and shall provide such written updates to Lessee, provided that exercise of such extension shall not modify the Lease Term.

       **3.**      **Disclaimer of Warranties.** The Lease is a "finance lease" under Article 2A of the UCC, and Lessee waives all rights and remedies Lessee may have under sections 2A-508 – 2A-522 thereof, including any right to cancel or repudiate the Lease or to reject or revoke acceptance of any Equipment. Upon the Effective Date, Lessee's Obligations (i) shall be non-cancelable, absolute and unconditional under all circumstances for the entire Lease Term, (ii) shall be unaffected by the loss or destruction of any

Equipment, and (iii) shall not be subject to any abatement, deferment, reduction, set-off, counterclaim, recoupment or defense for any reason whatsoever.  LESSOR IS NOT A VENDOR OR AGENT OF THE EQUIPMENT VENDOR, AND HAS NOT ENGAGED IN THE SALE OR DISTRIBUTION OF ANY EQUIPMENT.  RATHER, LESSEE ACKNOWLEDGES THAT ALL EQUIPMENT WAS DELIVERED DIRECTLY FROM VENDORS TO LESSEE AT ITS HAZELTON, PENNSYLVANIA LOCATION. LESSOR MAKES NO EXPRESS OR IMPLIED REPRESENTATIONS OR WARRANTIES AS TO MERCHANTABILITY, PERFORMANCE, CONDITION, EXISTENCE, FITNESS OR SUITABILITY FOR LESSEE'S PURPOSES OF ANY EQUIPMENT, PATENT, TRADEMARK OR COPYRIGHT INFRINGEMENTS, THE CONFORMITY OF THE EQUIPMENT TO THE DESCRIPTION THEREOF IN THE LEASE, OR ANY OTHER REPRESENTATION OR WARRANTY OF ANY KIND WITH RESPECT TO THE EQUIPMENT.  If Equipment is not delivered or properly installed, does not operate as warranted, becomes obsolete, or is unsatisfactory for any reason, Lessee shall make all claims on account thereof solely against Vendors and not against Lessor, and Lessor shall assist Lessee as reasonably necessary to permit Lessee to do so.  Lessee is solely responsible for the selection, shipment, delivery and installation of the Equipment and its Vendors, expressly disclaims any reliance upon any statements or representations made by Lessor in connection therewith, and has received and approved the terms of any purchase orders, warranties, licenses or agreements with respect to the Equipment.  During the Lease Term, Lessee shall be entitled, on a non-exclusive basis, to enforce any applicable Vendor warranties, to the extent permitted thereby and by applicable law.  Lessor assigns such warranties to Lessee, to the extent permitted thereby, and agrees to cooperate with Lessee, at Lessee's sole cost and expense, in making any reasonable claim against such Vendor arising from any defect in the Equipment.

    **4.**    **Use; Maintenance; Location; Inspection.**  Lessee shall:  (i) use, operate, protect and maintain the Equipment (a) in good operating order, repair, condition and appearance, in the same condition as when received, ordinary wear and tear excepted, (b) consistent with prudent industry practice (but in no event less than the extent to which Lessee maintains other similar equipment in the prudent management of its assets and properties), and (c) in compliance with all applicable insurance policies, laws, ordinances, rules, regulations and manufacturer's recommended maintenance and repair procedures, and (ii) maintain comprehensive books and records regarding the use, operation, maintenance and repair of the Equipment. The Equipment shall be used only at the Lessee's location in Hazelton, PA, solely for business purposes (and not for any consumer, personal, home, or family purpose), and shall not be abandoned or used for any unlawful purpose.  Lessee shall not discontinue use of any Equipment except for normal maintenance nor, through modifications, alterations or otherwise, impair the current or residual value, useful life, utility or originally intended function of any Equipment without Lessor's prior consent.  Any replacement or substitution of parts, improvements, upgrades, or additions to the Equipment during the Lease Term shall be the property of Lessor and subject to the Lease, except that if no Event of Default exists, Lessee may at its expense remove improvements or additions provided by Lessee that can be readily removed without impairing the value, function or remaining useful life of the Equipment.  Lessee shall cause the Equipment to be plainly marked to disclose Lessor's ownership, as specified by Lessor.  Lessee shall not change the location or, in the case of over-the-road vehicles, the base of any Equipment specified in Schedule A without Lessor's prior written consent.  Lessor shall have the right to enter any premises where Equipment is located and inspect it (together with related books and records) at any reasonable time.

    **5.**    **Loss and Damage.  Lessee assumes all risk of (and shall promptly notify Lessor in writing of any occurrence of) any damage to or loss, theft, confiscation or destruction of any Equipment from any cause whatsoever (a "Casualty") from the date shipped or otherwise made available to Lessee and continuing until it is returned to and accepted by Lessor in the condition required by the Lease, including Section 8 of this Agreement.  If any Equipment suffers a Casualty which Lessor reasonably determines is reparable, Lessee shall at its expense promptly place the same in good repair, condition or working order.  If any Equipment suffers a Casualty which Lessor reasonably determines is beyond repair or materially impairs its residual value (a "Total Loss"),**

**Lessee shall at Lessor's option either (a) promptly replace such Equipment with a similar item reasonably acceptable to Lessor having an equivalent value, utility and remaining useful life of such Equipment, whereupon such replacement items shall constitute Equipment for all purposes of the Lease, or (b) on the Rent payment date following such Casualty (or, if none, within 30 days) pay Lessor the Stipulated Loss Value for such Equipment, together with all Rent scheduled for payment on such date, and all accrued interest, late charges and other amounts then due and owing under the Lease. Upon such payment following a Total Loss, the Lease with respect to the Equipment suffering a Total Loss shall terminate, and Lessor shall transfer to Lessee all of its right, title and interest in such Equipment, free from all liens and encumbrances created by Lessor, but otherwise on an "AS-IS, WHERE-IS," quitclaim basis. If less than all Equipment on Schedule A suffers a Total Loss, (i) the Stipulated Loss Value with respect to any such item of Equipment shall be calculated by reference to the allocable portion of Rent or other amount related to such item, as reasonably determined by Lessor, and (ii) the remaining Rent shall be proportionately reduced as reasonably calculated by Lessor upon Lessor's receipt of the payments described above.**

      6.    **Insurance.** Lessee, at its own expense, shall keep each item of Equipment insured against all risks for its replacement value, and in no event less than its Stipulated Loss Value, and shall maintain public liability and, with respect to Equipment that is over-the-road vehicles, automotive liability insurance against such risks and for such amounts as Lessor may require. All such insurance shall (a) be with companies rated "A-" or better by A.M. Best Company, in such form as Lessor shall reasonably approve, (b) specify Lessor and Lessee as insureds and provide that it may not be canceled or altered in any way that would affect the interest of Lessor without at least 30 days' prior written notice to Lessor (10 days' in the case of nonpayment of premium), (c) be primary, without right of contribution from any other insurance carried by Lessor and contain waiver of subrogation and "breach of warranty" provisions satisfactory to Lessor, (d) provide that all amounts payable by reason of loss or damage to Equipment shall be payable solely to Lessor, unless Lessor otherwise agrees, and (e) contain such other endorsements as Lessor may reasonably require, to include at a minimum endorsements naming the Lessor as additional insured and lenders loss payable, with rights to receive copies of all notices sent to the Lessee with respect to such insurance. Lessee shall provide Lessor with evidence satisfactory to Lessor of the required insurance prior to the execution of this Agreement and on an annual basis thereafter.

      7.    **Indemnities; Taxes.** Lessee's indemnity and reimbursement obligations set forth below shall survive the cancellation, termination or expiration of the Lease or this Agreement.

      (a) General Indemnity. Lessee shall indemnify, on an after-tax basis, defend and hold harmless Lessor and its respective officers, directors, employees, agents and Affiliates ("**Indemnified Persons**") against all claims, liabilities, losses and expenses whatsoever (except those determined by final decision of a court of competent jurisdiction to have been directly and primarily caused by an Indemnified Person's gross negligence or willful misconduct), including court costs and reasonable attorneys' fees and expenses (together, "**Attorneys' Fees**"), in any way relating to or arising out of the Equipment or the Lease at any time, or the ordering, acquisition, rejection, installation, possession, maintenance, use, ownership, condition, destruction or return of the Equipment, including any claims based in negligence, strict liability in tort, personal injury, environmental liability manufacturing defect, or infringement.

      (b) General Tax Indemnity. Lessee shall pay or reimburse Lessor, and indemnify, defend and hold Lessor harmless from, on an after-tax basis, all taxes, assessments, fees and other governmental charges paid or required to be paid by Lessor or Lessee in any way arising out of or related to the Equipment or the Lease before or during the Lease Term or after the Lease Term following an Event of Default, including foreign, Federal, state, county and municipal fees, taxes and assessments, and property, value-added, sales, use, gross receipts, excise, stamp and documentary taxes, and all related penalties, fines, additions to tax and interest charges ("**Impositions**"), excluding only Federal and state taxes based on Lessor's net income unless such taxes are in lieu of any Imposition Lessee would otherwise be required to pay hereunder. Lessee

shall timely pay any Imposition for which Lessee is primarily responsible under law and any other Imposition not payable or not paid by Lessor, but Lessee shall have no obligation to pay any Imposition being contested in good faith and by appropriate legal proceedings, the nonpayment of which does not, in the opinion of Lessor, result in a material risk of adverse effect on the title, property, use, disposition or other rights of Lessor with respect to the Equipment.  Upon Lessor's request, Lessee shall furnish proof of its payment of any Imposition.

(c) Income Tax Indemnity.  Lessor shall be treated for federal and state income tax purposes as the owner of the Equipment and shall be entitled to take into account certain Tax Benefits in computing its income tax liabilities in connection with the Lease.  If Lessor suffers a Tax Loss by reason of any act or failure to act by Lessee, or Lessee's breach of any representation, warranty or agreement in the Lease then, upon Lessor's demand and at Lessor's option, either:  (i) all further Rent under the Lease, if any, shall be increased by an amount, or (ii) Lessee shall pay Lessor a lump sum amount, which in either case shall maintain the net economic after-tax yield, cash-flow and rate of return Lessor originally anticipated, based on Lessor's federal and state corporate income tax rate in effect on the Effective Date and other assumptions originally used by Lessor in evaluating the transaction and setting the Rent therefor and other terms thereof. Lessee shall also pay Lessor on demand all interest, costs (including Attorneys' Fees), penalties and additions to tax associated with the Tax Loss.  Lessor shall have no obligation to contest any Tax Loss.  All references to "**Lessor**" in this Section 7(c) shall include (A) Lessor's successors and Assignees, and (B) each member of the affiliated group of corporations, as defined in Section 1504(a) of the Code, of which Lessor or such successor or Assignee is at any time a member.  As used herein:  "**Tax Benefits**" means all items of income, deduction (including depreciation), credit, gain or loss relating to ownership of the Equipment as are provided to owners of similar equipment under the Code and applicable state tax laws in effect on the Effective Date; and "**Tax Loss**" means and will be deemed to be suffered if Lessor loses, is delayed in claiming, is required to recapture, is not allowed or may not claim all or any portion of any Tax Benefits reasonably anticipated by Lessor, provided, however, that Lessee shall be under no obligation to make any payments with respect to a Tax Loss to the extent that it (1) is caused by Lessor's failure to have sufficient taxable income to benefit from any Tax Benefits, or (2) results from any disposition of Equipment by Lessor other than a disposition of Equipment following an Event of Default or (3) results from the gross negligence or willful misconduct of Lessor or Lessor's employees, agents, contractors or accountants.

**8.     Return.**  Upon any cancellation, termination or expiration of the Lease (after the occurrence of an Event of Default or otherwise), Lessee shall, at its expense, cause the Equipment to be prepared and adequately protected for shipment by an authorized manufacturer's representative and either surrender it to Lessor in place or, if instructed by Lessor, ship the Equipment to Lessor, freight and insurance pre-paid, to a place designated by Lessor within the 48 contiguous United States or Canada, in the condition required under Section 4 hereof, able to be put into immediate service and to perform at manufacturer's rated levels (if any), together with all related manuals, documents and records, and, if applicable, reassembled by an authorized manufacturer's representative and immediately qualified for the manufacturer's (or its authorized servicing representative's) then available service contract or warranty, but subject to reasonable ordinary wear and tear.  If requested by Lessor, Lessee shall, at its expense:  (i) cause the Equipment to qualify for all applicable licenses or permits necessary for its operation and for its intended purpose, and to comply with all specifications and requirements of applicable federal, state and local laws, regulations and ordinances, including related to safety, to the extent the Equipment so qualified and complied at the beginning of the Lease Term and such laws, regulations and ordinances continue to apply at the end of the Lease Term; (ii) provide safe, suitable storage, reasonably acceptable to Lessor, for the Equipment for a period not to exceed 90 days from the date of return; and (iii) reasonably cooperate with Lessor in attempting to remarket the Equipment, including display and demonstration to prospective parties, and allowing Lessor to conduct a private sale on Lessee's premises (subject to reasonable requirements of Lessee and Lessee's insurer, and provided further that such sale takes place within 120 days).  If Lessee does not surrender or return any item of Equipment to Lessor on the date or in the condition required under

the Lease, in addition to all other available rights and remedies, at Lessor's election, such Equipment shall continue to be subject to all the terms and conditions of the Lease, with Rent and other charges continuing to accrue and be payable under the Lease with respect to such Equipment until it is so surrendered or returned to Lessor, except that Rent shall accrue at 125% of the last Rent allocable to such item of Equipment (as reasonably calculated by Lessor) during the Lease Term, payable on demand.

9.      **Lessee Representations and Agreements.**  Lessee represents, warrants and agrees that: (a) Lessee has had for the previous 5 years or, if a shorter period, as long as it has existed (except as previously disclosed to Lessor in writing) the legal name and form of business organization in the state described above; (b) Lessee's chief executive office and notice address, taxpayer identification number and any organizational identification number is as described with its execution of this Agreement below; (c) Lessee shall notify Lessor in writing at least 30 days before changing its legal name, state of organization, chief executive office location or organizational identification number; (d) Lessee is duly organized and existing in good standing under the laws of the state described above and all other jurisdictions where legally required in order to carry on its business, shall maintain its good standing in all such jurisdictions, and shall conduct its businesses and manage its properties (and cause each of its Affiliates to conduct its businesses and manage its properties) in compliance with all applicable laws, rules or regulations binding, in any jurisdiction, on Lessee and its Affiliates including, without limitation, all anti-money laundering laws and regulations; (e) the execution, delivery and performance of this Agreement, the Lease and any Related Agreement to which it is a party has been duly authorized by Lessee, each of which are and will be binding on and enforceable against Lessee in accordance with their terms, and do not and will not contravene any other instrument or agreement binding on Lessee; (f) there is no pending litigation, tax or environmental claim, proceeding, dispute or regulatory or enforcement action (and Lessee shall promptly notify Lessor of any of the same that may hereafter arise) that may adversely affect any Equipment or Lessee's financial condition or impair its ability to perform its Obligations; (g) Lessee will not lend any money to or otherwise provide financing to a third party without the advance written approval of Lessor.

10.      **Title; Personal Property; Additional Security.**  (a) <u>Title; Personal Property</u>.  The Lease is and is intended to be a lease of personal property for all purposes.  Lessee does not acquire any right, title or interest in or to any Equipment, except the right to use and possess the same under the terms of the Lease. Lessee has no right or option to extend the Lease Term or purchase any Equipment, except that (i) Lessee may purchase the Equipment at the end of the Lease Term by exercising its purchase option to purchase the Equipment for $1.00, and (ii) Lessee may purchase the Equipment prior to the end of the Lease Term by exercising its purchase option to purchase the Equipment for the Stipulated Loss Value as of the date of purchase. To the extent not already accomplished, Lessee assigns all of its rights to purchase the Equipment from the Vendors. Lessee acknowledges that Lessor is the sole owner of Equipment.  Lessor represents that the Equipment is free and clear of all liens or encumbrances, other than Lessee's rights under the Lease, and represents that upon the purchase of the Equipment pursuant to this Section 10, Lessor will transfer all right, title and interest in and to the Equipment to Lessee, free and clear of all liens or encumbrances.  Lessee will not create or permit to exist any lien, security interest, charge or encumbrance on any Equipment except those created by Lessor, and covenants to remove the current lien of Ben Franklin Technology Partnership within forty-five (45) days of the Effective Date.  The Equipment shall remain personal property at all times, notwithstanding the manner in which it may be affixed to realty.  Lessee shall obtain and record such instruments and take such steps as may be necessary to (i) prevent any creditor, landlord, mortgagee or other entity (other than Lessor) from having any lien, charge, security interest or encumbrance on any Equipment, and (ii) ensure Lessor's right of access to and removal of Equipment in accordance with the Lease.

(b) <u>Additional Security</u>.  To secure the punctual payment and performance of Lessee's Obligations under the Lease and, as a separate grant of security, to secure the payment and performance of all other Obligations owing to Lessor, Lessee grants to Lessor a security interest in the Collateral, <u>provided, however</u>,

that if there then exists no Event of Default, Lessor's security interest in Collateral subject to the Lease shall terminate upon the payment and performance of all Obligations of Lessee under the Lease. Notwithstanding the grant of a security interest in the Collateral, Lessee shall have no right to sell, lease, rent, dispose or surrender possession, use or operation of any Equipment to any third parties without the prior written consent of Lessor.  The foregoing grant of a security interest shall not of itself be a factor in determining whether the Lease creates a lease or security interest in the Equipment under applicable provisions of the UCC.

     **11.**    **Default.**  Each of the following (a "**Default**") shall, with the giving of any notice or passage of any time period specified, constitute an "**Event of Default**" hereunder and under the Lease:  (a) Lessee fails to pay any Rent within ten (10) days after the date due, or after any amount owing under the Lease when due; (b) Lessee fails to maintain insurance as required herein (and such failure continues for ten (10) days after written notice to Lessee), or sells, leases, subleases, assigns, conveys, or suffers to exist any lien, charge, security interest or encumbrance on, any Equipment without Lessor's prior consent, or any Equipment is subjected to levy, seizure or attachment; (c) Lessee fails to perform or comply with any other covenant or obligation under the Lease or any Related Agreement and, if curable, such failure continues for 30 days after written notice thereof by Lessor to Lessee, provided that, for the avoidance of doubt, the parties agree that a breach of Section 9(g) of this Agreement is not curable; (d) any representation, warranty or other written statement made to Lessor by Lessee in connection with this Agreement, the Lease, any Related Agreement or other Obligation (including financial statements) proves to have been incorrect in any material respect when made; (e) Lessee (i) enters into any merger or consolidation with, or sells or transfers all or any substantial portion of its assets to, or enters into any partnership or joint venture other than in the ordinary course of business with, any entity other than Lessor or an Affiliate of Lessor, (ii) dissolves, liquidates or ceases or suspends the conduct of business, or ceases to maintain its existence, or (iii) enters into or suffers any transaction or series of transactions as a result of which Lessee is directly or indirectly controlled by persons or entities not directly or indirectly controlling Lessee as of the date hereof, other than any transaction or series of transactions the result of which is direct or indirect control by Lessor or an Affiliate of Lessor; (f) Lessee undertakes any general assignment for the benefit of creditors or commences any voluntary case or proceeding for relief under the federal bankruptcy code, or any other law for the relief of debtors, or takes any action to authorize or implement any of the foregoing; (g) the filing of any petition or application against Lessee under any law for the relief of debtors, including proceedings under the federal bankruptcy code, or for the subjection of property of Lessee to the control of any court, receiver or agency for the benefit of creditors if such petition or application is consented to by Lessee or is otherwise not dismissed within 60 days from the date of filing; (h) any default occurs under any other lease, credit or other agreement or instrument to which Lessee and Lessor or any Affiliate of Lessor are now or hereafter party; (i) any default occurs under any other agreement or instrument to which Lessee is a party and under which there is outstanding, owing or committed an aggregate amount greater than $90,000; (j) Lessee enters into any other lease, credit or other financing agreement or arrangement without the prior written notice to Lessor; (k) Lessee makes a payment to any Affiliate or non-Affiliate party that is outside of the ordinary course of business in the operations of Lessee.  Lessee shall promptly notify Lessor in writing of any Default or Event of Default.

     **12.**    **Remedies.**  (a) Upon the occurrence of an Event of Default and during the continuance thereof, Lessor may, in its discretion, exercise any one or more of the following remedies with respect to the Lease or any Equipment:  (i) cause Lessee to promptly discontinue use of or disable any Equipment, or to assemble and return any Equipment or other Collateral in accordance with the terms of the Lease; (ii) remedy such Event of Default or proceed by court action, either at law or in equity, to enforce performance of the applicable provisions of the Lease; (iii) with or without court order, enter upon the premises where Equipment is located and repossess and remove the same, all without liability for damage to such premises or by reason such entry or repossession, except for Lessor's gross negligence or willful misconduct; (iv) dispose of any Equipment in a public or private transaction, or hold, use, operate or keep

idle the Equipment, free and clear of any rights or interests of Lessee therein; (v) recover direct, incidental, consequential and other damages for the breach of the Lease, including the payment of all Rent and other amounts payable thereunder, and all reasonable costs and expenses incurred by Lessor in exercising its remedies or enforcing its rights thereunder (including all reasonable Attorneys' Fees); (vi) by written notice to Lessee, cancel the Lease and, as liquidated damages for the loss of Lessor's bargain and not as a penalty, declare immediately due and payable an amount equal to the Stipulated Loss Value applicable to the Lease which Lessee acknowledges to be reasonable liquidated damages in light of the anticipated harm to Lessor that might be caused by an Event of Default and the facts and circumstances existing as of the Effective Date; (vii) without notice to Lessee, apply or set-off against any Obligations all security deposits, advance payments, proceeds of letters of credit, certificates of deposit (whether or not matured), securities or other additional collateral held by Lessor or otherwise credited by or due from Lessor to Lessee; or (viii) pursue all other remedies provided under the UCC or other applicable law.  Upon the commencement of any voluntary case under the federal bankruptcy code concerning the Lessee, the remedy provided in clause (vi) above shall be automatically exercised without the requirement of prior written notice to Lessee or of any other act or declaration by Lessor, and the liquidated damages described therein shall be immediately due and payable, and interest shall accrue at the Default Rate.  Lessee shall pay interest equal to the lesser of (a) the interest rate otherwise applicable hereunder plus three percent (3.0%), or (b) the highest rate permitted by applicable law ("**Default Rate**") on (i) any amount other than Rent owing under the Lease at any time and not paid when due, (ii) Rent not paid within 10 days of its due date, and (iii) any amount required to be paid upon cancellation of the Lease under this Section 12.  Any payments received by Lessor after an Event of Default, including proceeds of any disposition of Equipment, shall be applied in the following order:  (A) to all of Lessor's costs (including Attorneys' Fees), charges and expenses incurred in taking, removing, holding, repairing and selling or leasing the Equipment or other Collateral or enforcing the provisions hereof; (B) to the extent not previously paid by Lessee, to pay Lessor for any damages then remaining unpaid hereunder; (C) to reimburse Lessee for any sums previously paid by Lessee as damages hereunder; and (D) the balance, if any, shall be retained by Lessor.

(b) No remedy referred to in this Section 12 shall be exclusive, each shall be cumulative (but not duplicative of recovery of any Obligation) and in addition to any other remedy referred to above or otherwise available to Lessor at law or in equity, and all such remedies shall survive the cancellation of the Lease.  Lessor's exercise or partial exercise of, or failure to exercise, any remedy shall not restrict Lessor from further exercise of that remedy or any other available remedy.  No extension of time for payment or performance of any Obligation shall operate to release, discharge, modify, change or affect the original liability of Lessee for any Obligations, either in whole or in part.  Lessor may proceed against any Collateral, or may proceed contemporaneously or in the first instance against Lessee, in such order and at such times following an Event of Default as Lessor determines in its sole discretion.  In any action to repossess any Equipment or other Collateral, Lessee waives any bonds and any surety or security required by any applicable laws as an incident to such repossession.  Notices of Lessor's intention to accelerate, acceleration, nonpayment, presentment, protest, dishonor, or any other notice whatsoever (other than notices of Default specifically required of Lessor pursuant to Section 11 above) are waived by Lessee.  Any notice given by Lessor of any disposition of Collateral or other intended action of Lessor which is given in accordance with this Agreement at least 5 business days prior to such action, shall constitute fair and reasonable notice of such action.

13. **Assignment.**  Lessor (and any Assignee of Lessor) may assign or transfer any of Lessor's interests in the Lease or any Equipment without notice to Lessee, subject, however, to the rights of Lessee to use and possess the Equipment under the Lease for so long as no Event of Default has occurred and is continuing.  Lessee agrees that: (i) the rights of any Assignee shall not be affected by any breach or default of Lessor or any prior Assignee, and Lessee shall not assert any defense, rights of set-off or counterclaim against any Assignee, nor hold or attempt to hold such Assignee liable for any such breach or default; (ii) no Assignee shall be required to assume any obligations of Lessor under the Lease except the obligation of

non-interference in Section 1 above, (iii) any Assignee must, as a condition of such assignment, expressly assume the obligations of Lessor and shall thereupon be responsible for Lessor's duties under the Lease accruing after assignment and Lessor shall be released from such duties provided that Lessor has provided a valid and effective assignment evidencing the foregoing to Lessee, and (iv) Lessee shall execute and deliver upon request such additional documents, instruments and assurances as Lessor deems reasonably necessary in order to (y) acknowledge and confirm all of the terms and conditions of the Lease and Lessor's or such Assignee's rights with respect thereto, and Lessee's compliance with all of the terms and provisions thereof, and (z) preserve, protect and perfect Lessor's or Assignee's right, title or interest hereunder and in any Equipment, including, without limitation, such UCC financing statements or amendments, control agreements, corporate or member resolutions, votes, notices of assignment of interests, and confirmations of Lessee's obligations and representations and warranties with respect thereto as of the dates requested. Lessor may disclose to any potential Assignee any information regarding Lessee and its Affiliates. **Lessee shall not assign, pledge, hypothecate or in any way dispose of any of its rights or obligations under the Lease, or enter into any sublease of any Equipment, without Lessor's prior written consent.  Any purported assignment, pledge, hypothecation, disposal or sublease by Lessee made without Lessor's prior written consent shall be null and void.**

14.     **Financial and Other Data.**  (a) During the Lease Term, Lessee shall (i) maintain books and records in accordance with generally accepted accounting principles consistently applied ("GAAP") and prudent business practice; (ii) at its own expense, submit to Lessor accountant-prepared audited annual financial statements in respect of Lessee within ninety (90) days of each of the Lessee's fiscal year end commencing with the fiscal year ending on or about December 31, 2021 and, if so requested by Lessor, a report of the Lessee's certified public accountant (meeting Lessor's reasonable standards) thereon, and income tax returns in respect of Lessee within one hundred-twenty (120) days of each of the Lessee's tax year ends (or any extension of time for filing); (iii) at its own expense, submit to Lessor, no later than thirty (30) days following the end of each month, an internal balance sheet, income statement and profit and loss statements for Lessor, certified by an officer of Lessee to be true and correct; (iv) permit Lessor or its representatives to, at all reasonable times, inspect and verify Lessor's books and records and, without prior notice, to have the books and records of Lessee (including all tax returns) examined or audited at Lessor's expense and the Lessee shall cooperate fully with Lessor or its representatives making such examination or audit; and (v) furnish Lessor all other financial information and reports and such other information as Lessor may reasonably request concerning Lessee and its affairs, or the Equipment or its condition, location, use or operation.

(b) Lessee represents and warrants that all information and financial statements at any time furnished by or on behalf of Lessee are accurate and reasonably reflect as of their respective dates, results of operations and the financial condition of Lessee or other entity they purport to cover.  Credit and other information regarding Lessee or their Affiliates, the Lease or any Equipment may be disclosed by Lessor to its Affiliates, agents and potential Assignees, notwithstanding anything contained in any agreement that may purport to limit or prohibit such disclosure.

15.     **Definitions**.

As used herein, the following terms shall have the meanings assigned or referred to them below:

"**Affiliate**" means any entity controlling, controlled by or under common control with the referent entity; "**control**" includes (i) the ownership of 25% or more of the voting stock or other ownership interest of any entity and (ii) the status of a general partner of a partnership or managing member of a limited liability company.

"**Assignee**" means any assignee or transferee of all or any of Lessor's right, title and interest in the Lease or any Equipment.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Collateral**" means and includes all of Lessee's right, title and interest in and to all Equipment, together with: (i) all parts, attachments, accessories and accessions to, substitutions and replacements for, each item of Equipment; (ii) all accounts, chattel paper, and general intangibles arising from or related to any sale, lease, rental or other disposition of any Equipment to third parties, or otherwise resulting from the possession, use or operation of any Equipment by third parties, including instruments, investment property, deposit accounts, letter of credit rights, and supporting obligations arising thereunder or in connection therewith; (iii) all insurance, warranty and other claims against third parties with respect to any Equipment; (iv) all software and other intellectual property rights used in connection therewith; (v) proceeds of all of the foregoing, including insurance proceeds and any proceeds in the form of goods, accounts, chattel paper, documents, instruments, general intangibles, investment property, deposit accounts, letter of credit rights and supporting obligations; and (vi) all books and records regarding the foregoing, in each case, now existing or hereafter arising.

"**Equipment**" means the items, units and groups of personal property, licensed materials and fixtures described in Schedule A, together with all replacements, parts, additions, accessories and substitutions therefor; and "**item of Equipment**" means a "commercial unit" as defined and described in Article 2A of the UCC, and includes each functionally integrated and separately marketable group or unit of Equipment.

"**Lease Term**" means 120 months from the Effective Date.

"**Manufacturing Agreement**" means that certain Amended and Restated Nexii Certified Manufacturing Agreement by and between Lessor and Lessee, dated as of October 7, 2020, as the same may be amended, restated, amended and restated, supplemented, or modified from time to time.

"**Obligations**" means and includes all obligations of Lessee owing to Lessor under this Agreement, the Lease, any Related Agreement, or the Manufacturing Agreement, together with all other obligations, indebtedness and liabilities of Lessee to Lessor under any other financings, leases, loans, notes, progress payment agreements, guaranties or other agreements, of every kind and description, now existing or hereafter arising, direct or indirect, joint or several, absolute or contingent, whether for payment or performance, regardless of how the same may arise or by what instrument, agreement or book account they may be evidenced, including without limitation, any such obligations, indebtedness and liabilities of Lessee to others which may be obtained by Lessor through purchase, negotiation, discount, transfer, assignment or otherwise.

"**Related Agreement**" means and includes any approval letter or progress payment, assignment, security or other agreement or addendum related to this Agreement, the Lease, the Collateral or any other collateral to which Lessee is a party.

"**Stipulated Loss Value**" means, as of any particular date the ("**SLV Date**"): (a) all unpaid Rent and other amounts that are due but unpaid as of the SLV Date under this Agreement (including interest at the rate described in Section 2 (or, during the continuation of an Event of Default, such interest rate plus three percent (3.0%)) from the last Rent payment made by Lessee to the SLV Date, as well as late fees and attorneys' fees, as allowed in the Lease), plus (b) the amount identified on Exhibit 1 hereto next to the date on such Exhibit 1 that is next to occur after the SLV Date (ex. if the date of calculation is January 5, 2023, the date referenced on Exhibit 1 would be February 1, 2023), plus (c) $1. In the event of a Total Loss of any Equipment as described in Section 5, the Stipulated Loss Value would be calculated as set forth above for any of the items suffering a Total Loss as the percentage of the Equipment represented by the Equipment suffering a Total Loss divided by the same calculation for the entire list of Equipment set forth on Schedule

A.  Upon a change in the interest rate as described in Section 2, the Lessor shall update Exhibit 1 to reflect application of the new interest rate and provide written (including by email) notice of such updated Exhibit 1 to Lessee.

"**UCC**" means the Uniform Commercial Code in effect in the state specified in Section 16(f) of this Agreement.

"**Vendor**" means any manufacturer, distributor, supplier or other seller (whether or not a merchant or dealer) of the Equipment and any sales representative or agent thereof.

**16.    Miscellaneous.**  (a) At Lessor's request, Lessee shall execute, deliver, file and record such financing statements and other documents as Lessor deems reasonably necessary to protect Lessor's interest in the Equipment and to effectuate the purposes of the Lease or any Related Agreement, and Lessee authorizes, and irrevocably appoints Lessor as its agent and attorney-in-fact, with right of substitution and coupled with an interest, to (i) execute, deliver, file, and record any such item, and to take such action for Lessee and in Lessee's name, place and stead, (ii) make minor corrections to manifest errors in factual data in Schedule A and any addenda, attachments, exhibits and riders thereto, and (iii) after the occurrence of an Event of Default, enforce claims relating to the Equipment against insurers, Vendors or other persons, and to make, adjust, compromise, settle and receive payment under such claims; but without any obligation to do so.

(b) Federal law requires all financial institutions to obtain, verify and record information that identifies each entity that obtains a loan or other financial accommodation.  Lessee shall, promptly upon the request by Lessor, provide the Lessee's legal name, address, tax ID number and other identifying information.  Lessee shall promptly provide copies of business licenses or other documents evidencing the existence and good standing of Lessee requested by Lessor.

(c) Time is of the essence in the payment and performance of all of Lessee's Obligations under the Lease or any Related Agreement.  This Agreement, and the Lease and any Related Agreement may be executed in one or more counterparts, each of which shall constitute one and the same agreement.  All demands, notices, requests, consents, waivers and other communications concerning this Agreement and the Lease or Related Agreement shall be in writing and shall be deemed to have been duly given when received, personally delivered or three business days after being deposited in the mail, first class postage prepaid, or the business day after delivery to an express carrier, charges prepaid, addressed to each party at the address provided herein, or at such other address as may hereafter be furnished in writing by such party to the other.

(d) Lessee shall reimburse Lessor on demand for all costs (including Attorneys' Fees) incurred by Lessor in connection with Lessee's exercise of any purchase or extension option under the Lease, or any amendment or waiver of the terms of this Agreement or the Lease or any Related Agreement requested by Lessee.

(e) Any provisions of this Agreement or the Lease or any Related Agreement which are unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such unenforceability without invalidating the remaining provisions thereof, and any such unenforceability shall not render unenforceable such provisions in any other jurisdiction.  Any requirement for the execution and delivery of any document, instrument or notice may be satisfied, in Lessor's discretion, by authentication as a record within the meaning of, and to the extent permitted by, Article 9 of the UCC.

(f) THIS AGREEMENT AND THE LEASE OR ANY RELATED AGREEMENT, AND THE LEGAL RELATIONS OF THE PARTIES THERETO, SHALL IN ALL RESPECTS BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF PENNSYLVANIA

WITHOUT REGARD TO CHOICE OF LAW PRINCIPLES; THE PARTIES CONSENT AND SUBMIT TO THE EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS OF SUCH STATE SITTING IN PHILADELPHIA, PENNSYLVANIA, FOR THE PURPOSES OF ANY SUIT, ACTION OR OTHER PROCEEDING ARISING THEREFROM, AND EXPRESSLY WAIVE ANY OBJECTIONS THAT IT MAY HAVE TO THE VENUE OF SUCH COURTS.  THE PARTIES EXPRESSLY WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY ACTION BROUGHT ON OR WITH RESPECT THERETO. IN NO EVENT SHALL LESSOR HAVE ANY LIABILITY TO LESSEE FOR INCIDENTAL, GENERAL, CONSEQUENTIAL, PUNITIVE OR EXEMPLARY DAMAGES.  Any cause of action by Lessee against Lessor relating to this Agreement or the Lease or any Related Agreement shall be brought within one year after any such cause of action first arises, and Lessee hereby waives the benefit of any longer period provided by statute.

(g) THE LEASE, TOGETHER WITH THIS AGREEMENT AND ANY RELATED AGREEMENTS, (i) CONSTITUTES THE FINAL AND ENTIRE AGREEMENT BETWEEN THE PARTIES WITH RESPECT TO THE SUBJECT MATTER HEREOF, SUPERSEDING ALL CONFLICTING TERMS OR PROVISIONS OF ANY PRIOR PROPOSALS, APPROVAL LETTERS, TERM SHEETS OR OTHER AGREEMENTS OR UNDERSTANDINGS BETWEEN THE PARTIES, INCLUDING, TO THE EXTENT (AND ONLY TO THE EXTENT) THE PROVISIONS ARE CONFLICTING, THE SHORT FORM LETTER AGREEMENTS EXECUTED OR CONTEMPLATED IN AUGUST 2021 AND SEPTEMBER 2021, SOLELY WITH RESPECT TO THE LEASE TERMS THEREUNDER, AND THE EXISTING LETTER AGREEMENT (ii) MAY NOT BE CONTRADICTED BY EVIDENCE OF (y) ANY PRIOR WRITTEN OR ORAL AGREEMENTS OR UNDERSTANDINGS, INCLUDING THE SHORT FORM LETTER AGREEMENTS EXECUTED OR CONTEMPLATED IN AUGUST 2021 AND SEPTEMBER 2021, AND THE EXISTING LETTER AGREEMENT, OR (z) ANY CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OR UNDERSTANDINGS BETWEEN THE PARTIES; and (iii) MAY NOT BE AMENDED, NOR MAY ANY RIGHTS THEREUNDER BE WAIVED, EXCEPT BY AN INSTRUMENT IN WRITING SIGNED BY THE PARTY CHARGED WITH SUCH AMENDMENT OR WAIVER.

(h)  This Lease is personally guaranteed by John Wolfington and Dan Metzler in an aggregate amount of $400,000 pursuant to a separate guaranty, which will expire upon the prepayment of $400,000 by Lessee above and beyond standard payments required hereunder or upon the payment of $400,000 to Lessor pursuant to said guaranty, all as more particularly provided, and subject to the terms of, the separate written guaranty executed in connection herewith.

(i)  Should Lessor make an equity purchase in Lessee (the "**Equity Purchase**") prior to the end of Lease Term, the amount of $400,000 may, at Lessor's option, be credited against the Equity Purchase, in which event Lessor shall immediately release the guaranty of John Wolfington and Dan Metzler described in the clause 16(h) of this Agreement.

(j) This Agreement supersedes, amends, restates and replaces the obligations of the Lessee under the Existing Letter Agreement in its entirety, and continues the obligations of the Lessee thereunder by the terms hereunder.  This Agreement is not intended to and shall not constitute a novation of the obligations under the Existing Letter Agreement.

**[Remainder of page intentionally left blank.]**

**In Witness Whereof,** Lessor and Lessee have executed this Agreement as of the date first above written.

Nexii Building Solutions, Inc

(Lessor)

By: _____

Print Name: Steve Sidwell

Title: CEO

_____

(Lessee)

By: _____

Print Name: _____

Title: _____

Taxpayer ID #: _____

Org. ID # (if any) _____

Chief Executive Office:

            101 Carleton Avenue

            Hazleton, PA 18201

**In Witness Whereof**, Lessor and Lessee have executed this Agreement as of the date first above written.

| | |
|---|---|
| _____ | _____ |
| (Lessor) | (Lessee) |
| By: _____ | By: ___ Nexus 1, LLC ___ |
| Print Name: _____ | Print Name: _John Wolfington_ |
| Title: _____ | Title: _Authorized Signatory_ |
| | Taxpayer ID #: ___ 85-2380419 ___ |
| | Org. ID # (if any) ___ N/A ___ |
| | Chief Executive Office: |
| | 101 Carleton Avenue |
| | Hazleton, PA 18201 |

Master Lease Agreement

13

EXHIBIT 1 TO

MASTER LEASE AGREEMENT

| Month | Date | Stipulated Loss Value |
|---|---|---|
| 1 | 5/1/2022 | $5,035,832.14 |
| 2 | 6/1/2022 | $5,011,598.54 |
| 3 | 7/1/2022 | $4,987,157.94 |
| 4 | 8/1/2022 | $4,962,508.59 |
| 5 | 9/1/2022 | $4,937,648.68 |
| 6 | 10/1/2022 | $4,912,576.43 |
| 7 | 11/1/2022 | $4,887,290.02 |
| 8 | 12/1/2022 | $4,861,787.62 |
| 9 | 1/1/2023 | $4,836,067.39 |
| 10 | 2/1/2023 | $4,810,127.47 |
| 11 | 3/1/2023 | $4,783,965.97 |
| 12 | 4/1/2023 | $4,757,581.02 |
| 13 | 5/1/2023 | $4,730,970.69 |
| 14 | 6/1/2023 | $4,704,133.06 |
| 15 | 7/1/2023 | $4,677,066.20 |
| 16 | 8/1/2023 | $4,649,768.14 |
| 17 | 9/1/2023 | $4,622,236.91 |
| 18 | 10/1/2023 | $4,594,470.52 |
| 19 | 11/1/2023 | $4,566,466.95 |
| 20 | 12/1/2023 | $4,538,224.19 |
| 21 | 1/1/2024 | $4,509,740.19 |
| 22 | 2/1/2024 | $4,481,012.89 |
| 23 | 3/1/2024 | $4,452,040.21 |
| 24 | 4/1/2024 | $4,422,820.05 |
| 25 | 5/1/2024 | $4,393,350.30 |

| 26 | 6/1/2024 | $4,363,628.84 |
| 27 | 7/1/2024 | $4,333,653.50 |
| 28 | 8/1/2024 | $4,303,422.13 |
| 29 | 9/1/2024 | $4,272,932.52 |
| 30 | 10/1/2024 | $4,242,182.49 |
| 31 | 11/1/2024 | $4,211,169.80 |
| 32 | 12/1/2024 | $4,179,892.21 |
| 33 | 1/1/2025 | $4,148,347.45 |
| 34 | 2/1/2025 | $4,116,533.25 |
| 35 | 3/1/2025 | $4,084,447.31 |
| 36 | 4/1/2025 | $4,052,087.30 |
| 37 | 5/1/2025 | $4,019,450.88 |
| 38 | 6/1/2025 | $3,986,535.69 |
| 39 | 7/1/2025 | $3,953,339.35 |
| 40 | 8/1/2025 | $3,919,859.45 |
| 41 | 9/1/2025 | $3,886,093.59 |
| 42 | 10/1/2025 | $3,852,039.30 |
| 43 | 11/1/2025 | $3,817,694.14 |
| 44 | 12/1/2025 | $3,783,055.61 |
| 45 | 1/1/2026 | $3,748,121.21 |
| 46 | 2/1/2026 | $3,712,888.41 |
| 47 | 3/1/2026 | $3,677,354.67 |
| 48 | 4/1/2026 | $3,641,517.41 |
| 49 | 5/1/2026 | $3,605,374.03 |
| 50 | 6/1/2026 | $3,568,921.94 |
| 51 | 7/1/2026 | $3,532,158.48 |
| 52 | 8/1/2026 | $3,495,081.00 |
| 53 | 9/1/2026 | $3,457,686.82 |
| 54 | 10/1/2026 | $3,419,973.22 |

| 55 | 11/1/2026 | $3,381,937.50 |
|----|-----------|---------------|
| 56 | 12/1/2026 | $3,343,576.88 |
| 57 | 1/1/2027 | $3,304,888.60 |
| 58 | 2/1/2027 | $3,265,869.86 |
| 59 | 3/1/2027 | $3,226,517.83 |
| 60 | 4/1/2027 | $3,186,829.67 |
| 61 | 5/1/2027 | $3,146,802.50 |
| 62 | 6/1/2027 | $3,106,433.44 |
| 63 | 7/1/2027 | $3,065,719.56 |
| 64 | 8/1/2027 | $3,024,657.92 |
| 65 | 9/1/2027 | $2,983,245.54 |
| 66 | 10/1/2027 | $2,941,479.43 |
| 67 | 11/1/2027 | $2,899,356.56 |
| 68 | 12/1/2027 | $2,856,873.90 |
| 69 | 1/1/2028 | $2,814,028.37 |
| 70 | 2/1/2028 | $2,770,816.86 |
| 71 | 3/1/2028 | $2,727,236.25 |
| 72 | 4/1/2028 | $2,683,283.40 |
| 73 | 5/1/2028 | $2,638,955.11 |
| 74 | 6/1/2028 | $2,594,248.18 |
| 75 | 7/1/2028 | $2,549,159.39 |
| 76 | 8/1/2028 | $2,503,685.46 |
| 77 | 9/1/2028 | $2,457,823.10 |
| 78 | 10/1/2028 | $2,411,569.01 |
| 79 | 11/1/2028 | $2,364,919.83 |
| 80 | 12/1/2028 | $2,317,872.19 |
| 81 | 1/1/2029 | $2,270,422.68 |
| 82 | 2/1/2029 | $2,222,567.87 |
| 83 | 3/1/2029 | $2,174,304.31 |

| 84 | 4/1/2029 | $2,125,628.49 |
|----|----------|---------------|
| 85 | 5/1/2029 | $2,076,536.90 |
| 86 | 6/1/2029 | $2,027,025.98 |
| 87 | 7/1/2029 | $1,977,092.17 |
| 88 | 8/1/2029 | $1,926,731.83 |
| 89 | 9/1/2029 | $1,875,941.33 |
| 90 | 10/1/2029 | $1,824,716.99 |
| 91 | 11/1/2029 | $1,773,055.12 |
| 92 | 12/1/2029 | $1,720,951.97 |
| 93 | 1/1/2030 | $1,668,403.76 |
| 94 | 2/1/2030 | $1,615,406.71 |
| 95 | 3/1/2030 | $1,561,956.98 |
| 96 | 4/1/2030 | $1,508,050.69 |
| 97 | 5/1/2030 | $1,453,683.96 |
| 98 | 6/1/2030 | $1,398,852.85 |
| 99 | 7/1/2030 | $1,343,553.38 |
| 100 | 8/1/2030 | $1,287,781.57 |
| 101 | 9/1/2030 | $1,231,533.37 |
| 102 | 10/1/2030 | $1,174,804.71 |
| 103 | 11/1/2030 | $1,117,591.51 |
| 104 | 12/1/2030 | $1,059,889.60 |
| 105 | 1/1/2031 | $1,001,694.82 |
| 106 | 2/1/2031 | $943,002.97 |
| 107 | 3/1/2031 | $883,809.78 |
| 108 | 4/1/2031 | $824,110.99 |
| 109 | 5/1/2031 | $763,902.27 |
| 110 | 6/1/2031 | $703,179.27 |
| 111 | 7/1/2031 | $641,937.60 |
| 112 | 8/1/2031 | $580,172.81 |

| 113 | 9/1/2031 | $517,880.46 |
| 114 | 10/1/2031 | $455,056.02 |
| 115 | 11/1/2031 | $391,694.96 |
| 116 | 12/1/2031 | $327,792.68 |
| 117 | 1/1/2032 | $263,344.58 |
| 118 | 2/1/2032 | $198,345.98 |
| 119 | 3/1/2032 | $132,792.19 |
| 120 | 4/1/2032 | $66,678.45 |

Nexii Building Solutions Inc.
1455 West Georgia Street
Vancouver, British Columbia V6G 2T3
CANADA

**Schedule A**

Customer Name:  NexUS 1, LLC

**Dated as of:  March 7, 2022**

**Lessee: NexUS 1, LLC**

**This Schedule A** shall be made a part of that Master Lease Agreement dated as of March 8, 2022 ("Lease"), between Lessee and Lessor.

In addition to authorities granted to Lessor under the Lease, Lessee further authorizes Lessor, as Lessee's attorney-in-fact, to correct any manifest errors in any of the information set forth on this Schedule A or any attachment thereto, including without limitation any amounts, percentages, options, terms, dates, and locations (collectively the "Information") as well as to make any other modifications to the Information resulting from changed circumstances occurring after the date hereof, provided, however, that Lessor shall give Lessee prompt written notice of any such modifications. Unless Lessee objects in writing within 5 business days after receipt of such notice, such modifications shall be deemed to be accepted and agreed by, and binding upon, Lessee.

| CUSTOMER INFORMATION | | | | | |
|---|---|---|---|---|---|
| NAME (Company Legal Name) | | DBA | | PHONE | |
| NexUS 1, LLC | | | | | |
| BILLING ADDRESS | CITY | COUNTY | STATE | | ZIP |
| 101 Carleton Avenue | Hazleton | Luzerne | Pennsylvania | | 18201 |
| EQUIPMENT LOCATION ADDRESS | CITY | COUNTY | STATE | | ZIP |
| 101 Carleton Avenue | Hazleton | Luzerne | Pennsylvania | | 18201 |

| EQUIPMENT INFORMATION | | |
|---|---|---|
| Quantity | Serial Number(s) | Make/Model/Description |
| TBD | TBD | Firing: Equipment |
| TBD | n/a | Firing: Structure |
| n/a | n/a | Firing: Installation + Commissioning |
| 2 | MCY7503-7393<br>MCY7502-7392 | AXYZ: CNC Router |
| TBD | 07-0001<br>07-0002<br>06-0001<br>06-0002<br>06-0003<br>06-0004<br>05-0001<br>05-0002<br>05-0003<br>05-0004<br>05-0005<br>03-0006<br>03-0005<br>03-0004<br>03-0003<br>03-0002<br>03-0001<br>02-0001<br>02-0002<br>01-0001<br>01-0002<br>01-0003<br>01-0004<br>01-0005<br>01-0006<br>01-0007<br>01-0008 | Metro: EPS, JIB Tables, Forms, Carts |
| TBD | 09-0001<br>09-0002<br>09-0003<br>10-0001<br>10-0002 | Metro: Horizonal + Vertical Carts |

4859-2667-0861\4

| | | |
|---|---|---|
| TBD | 04-0001<br>04-0002 | Metro: Small Hoppers for Manual Mixing |
| 6 | 2021 0449<br>2021 0451<br>2021 0452<br>2021 0450<br>2021 0478<br>2021 0477 | CSUnitec: Small Mixers |
| 5 | S11228- T1<br>S11228- T2<br>S11228- T3<br>S11228- T4<br>S11228- T5 | Ratec: Casting Beds |
| 1 | 8300: 210824-1 | CNC Hotwire: Hotwire |
| 5 | 2021058REV0-1<br>2021058REV0-2<br>2021058REV0-3<br>2021058REV0-4<br>2021058REV0-5 | Mussell Crane: Spreaderbars |
| 2 | UTY308618<br>UTY308619 | Quincy: Air Compressors |
| 1 | F009778 | Water Treatment Solutions: Envirosystem |
| TBD | TBD | Cantrol: Testing Equipment |
| TBD | TBD | National HVAC: HVAC System |